## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**GHANIM-ABDULRAHMAN**
**AL HARBI, et al.**

Petitioners,

v.

**BARACK H. OBAMA, et al,**

Defendants.

FILED WITH THE
COURT SECURITY OFFICER
CSO: _____
DATE: _____

Civil Action No. 05-02479 (HHK)

### MEMORANDUM OPINION

Ravil Mingazov (ISN 702), a Russian citizen, left Russia in 2000 and was taken into custody in Pakistan in March 2002. The United States has held him at the naval base detention facility in Guantanamo Bay, Cuba since June 2002. Mingazov has filed a petition for a writ of habeas corpus contending that he is unlawfully detained. Respondents in this case, President Barack H. Obama and other high-level officials in the United States Government, argue that Mingazov is lawfully detained and therefore should remain in U.S. custody. The parties filed cross-motions for judgment on the record and appeared before this Court for a hearing on the merits of Mingazov's petition on April 12, 13, 14, and 15, 2010. Upon consideration of the motions and the evidence presented at the merits hearing, the Court concludes that respondents have not demonstrated that the detention of Mingazov is lawful. Therefore, Mingazov's petition shall be granted.

### I. LEGAL STANDARDS

#### A.     Scope of the Government's Detention Authority

The Authorization for Use of Military Force ("AUMF"), Pub. L. No. 107-40, 115 Stat. 224 (2001), authorizes the President to "use all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the

SECRET

terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons,

in order to prevent any future acts of international terrorism against the United States by such

nations, organizations, or persons." Pub. L. 107-40, § 2(a), 115 Stat. at 224. The U.S. Supreme

Court has held that the District Court for the District of Columbia has jurisdiction over petitions

for writs of habeas corpus brought by detainees held at Guantanamo Bay pursuant to the AUMF.

*See Boumediene v. Bush*, 553 U.S. 723, —, 128 S. Ct. 2229, 2274 (2008); *Rasul v. Bush*, 542

U.S. 466, 483-84 (2004). The Supreme Court has provided "scant guidance," however, as to

whom respondents may lawfully detain under the statute. *Al-Bihani v. Obama*, 590 F.3d 866,

870 (D.C. Cir. 2010) (noting that the Supreme Court has "consciously le[ft] the contours of the

substantive and procedural law of detention open for lower courts to shape in a common law

fashion" (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 522 n.1 (2004) (plurality opinion of

O'Connor, J.); *Boumediene*, 128 S. Ct. at 2276)).

In the absence of controlling law governing the question of by what standard to evaluate

the lawfulness of the detention of the individuals held at Guantanamo Bay, the Court shall rely

on the reasoning of other Judges of this Court who have thoroughly and thoughtfully addressed

this issue. Accordingly, consistent with Judge Bates's ruling in *Hamlily v. Obama*, 616 F. Supp.

2d 63 (D.D.C. 2009), the government may detain "those who are 'part of' the 'Taliban or al

Qaida forces.'" *Id.* at 69-70.[1] As Judge Walton ruled in *Gherebi v. Obama*, 609 F. Supp. 2d 43

(D.D.C. 2009), such membership requires that the person in question "have some sort of

---

[1]     "It is not in dispute that Al Qaeda is the organization responsible for September 11," *Al-Bihani*, 590 F.3d at 873, and is therefore among the entities to which the AUMF refers. There seems also to be no dispute that the Taliban is an "associated force," which "the government's detention authority also reaches." *Hamlily*, 616 F. Supp. 2d at 74.

SECRET

'structured' role in the 'hierarchy' of the enemy force." *Id.* at 68. Noting that "there is a distinction to be made between members of a terrorist organization involved in combat operations and civilians who may have some tangential connections to such organizations," Judge Walton wrote, and this Court agrees, that "[t]he key question is whether an individual 'receive[s] and execute[s] orders' from the enemy force's combat apparatus." *Id.* at 69 (alterations in original).

## B.  Burden of Proof

As stated in the Amended Case Management Order that governs this case, "[t]he government bears the burden of proving by a preponderance of the evidence that the petitioner's detention is lawful." *In re Guantanamo Bay Litig.*, Misc. No. 08-442, CMO § II.A (Nov. 6, 2008). Accordingly, Mingazov need not prove that he is unlawfully detained; rather, respondents must produce "evidence which as a whole shows that the fact sought to be proved," that Mingazov was part of Al Qaeda or an associated force, "is more probable than not." *United States v. Mathis*, 216 F.3d 18, 28 (D.C. Cir. 2000) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 & n.2 (D.C. Cir. 1994)); *see also Al-Bihani*, 590 F.3d at 878 (rejecting Guantanamo Bay detainee's argument that application of the preponderance of the evidence standard in his habeas case was unconstitutional). If respondents fail to meet this burden, the Court must grant Mingazov's petition and order his release.

## C.  Evidentiary Issues

The Court notes at the outset two issues regarding the evidence in this case.

First, as explained in the Court's August 26, 2009 order [#270], the Court has permitted the admission of any hearsay evidence the parties seek to present and considers at this merits

SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

stage the accuracy, reliability, and credibility of the evidence on which the parties rely to support

their arguments. This approach is consistent with a directive from the D.C. Circuit. *See Al-*

*Bihani*, 590 F.3d at 879 ("[T]he question a habeas court must ask when presented with hearsay is

not whether it is admissible—it is always admissible—but what probative weight to ascribe to

whatever indicia of reliability it exhibits."). The Court's assessment of the weight properly

accorded to particular pieces of evidence appears throughout this memorandum opinion.

Second, the nature of the evidence before the Court is atypical of evidence usually

presented in federal actions. Respondents have offered a variety of types of documents produced

and used by government intelligence agencies that are not the direct statements of the individuals

whose personal knowledge they reflect. Several of the crucial pieces of evidence in this case are

Intelligence Information Reports ("IIRs"), Summary Interrogation Reports ("SIRs"), Field

Documents ("FD-302s"), Form 40s ("FM40s") ███████████████████ IIRs

are Department of Defense documents for recording information derived from human sources.

SIRs █████████████████████████████████████

████ An SIR differs from an IIR █████████████████████

because an SIR █████████████████████████████ FD-

302s are forms completed by FBI agents summarizing interviews. One particularly important

piece of evidence before the Court is an Electronic Communication ("EC"), which is akin to an

FD-302. FM40s are records of investigation activities, here witness interviews, conducted by the

Criminal Investigation Task Force ("CITF"), a federal law enforcement agency. ███████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

4
SECRET

UNCLASSIFIED//FOR PUBLIC RELEASE

SECRET

Joint Exhibit ("JE") 45 at 7 (declaration of a Defense Intelligence Agency employee describing, *inter alia*, types of intelligence reports).

Respondents and Mingazov present these documents as evidence because more typical kinds of evidence—such as live testimony, which allows for cross-examination—is not made available in these cases. Although the Court accepts the documents and accords them the weight it believes they are due, the Court is mindful that they are not testimony. In particular, documents that are summaries of interrogations should not be equated with verbatim recitations of those interrogations. For example, the only evidence in the record that sheds light on the difference between interview notes and an interrogation report demonstrates how distinct such reports are from transcripts. *Compare* JE 8 (FD-302 summarizing interrogation of Mingazov on May 28, 2003) *with* Petitioner's Exhibit ("PE") 11 (notes of interrogator from May 28, 2003 interview of Mingazov). The FD-302 summarizes the topics discussed during the interrogation in a different order than they appear in the notes, leaves out some information included in the notes, and, in at least one instance, includes information that appears to be the interrogator's extrapolation from Mingazov's comments without so noting. *See, e.g.*, JE 8 at 1 (reporting in the first substantive paragraph that "Mingazov does not like [Guantanamo Bay], but he does not want to go back to Russia either" and "[r]eturning home to Russia is not an inducement to talk for him"); PE 11 at 1, 2 (containing over a page of notes before addressing the topic of Mingazov's lack of desire to go to Russia, then including the lines "I am not in a hurry to get back to Russia," and "[i]t is better to be here (for him) than to be in Russia," and nowhere mentioning whether the possibility of going to Russia would be an inducement to talk).

## II. ANALYSIS

5

SECRET

Mingazov, or ISN 702,[2] was born in Russia in 1967. According to a declaration he prepared for use in this litigation, much of the contents of which is uncontested, he spent most of his youth in Naberezhyne Chelny, a city in Tatarstan, Russia. He studied ballet there and became a dancer with various ballet troupes. He joined the Russian Army, which has its own dance troupe, in 1987 and later became a guard along the border of Russia and Mongolia. In 1991, he returned to Naberezhyne Chelny, where he worked at a military installation for several years. Mingazov, who is Muslim, married a Muslim woman in the late 1990s and became increasingly religious and observant. His commitment to his religion led to conflicts with his superiors in the Army, who were unwilling to accommodate Muslim dietary restrictions and generally not accepting of the Islamic faith. In 1999, Mingazov and his wife had a child. Shortly thereafter, he decided to leave Russia so he and his family could live in a Muslim country. To that end, Mingazov traveled to Tajikistan in 2000. He later traveled to Afghanistan and ultimately Pakistan, where he was captured by Pakistani authorities in March 2002. American forces took custody of him, held him at a detention center in Bagram, Afghanistan until June 2002, and then transferred him to Guantanamo Bay, where he has since been detained.

Mingazov's actions while in Tajikistan, Afghanistan, and Pakistan, as well as the implications of some undisputed underlying facts, are in dispute. Respondents contend that Mingazov joined a group called the Islamic Movement of Uzbekistan ("IMU"), then fought with the Taliban, and finally received military training from Al Qaeda before his capture in a house affiliated with Al Qaeda. Mingazov maintains that respondents have failed to meet their burden

---

[2]      ISN stands for Internment Serial Number. *See* JE 10 at 1. Each detainee at Guantanamo Bay has been assigned with such a number.

SECRET

SECRET

of proof as to any of these accusations.

Pursuant to an order of the Court, the parties identified the issues in dispute and structured their presentations to address each issue in turn during the hearing. This memorandum opinion addresses each contested issue and then considers the reliable evidence as a whole to explain the Court's conclusion that respondents have not demonstrated by a preponderance of the evidence that Mingazov was part of any enemy force.

**A.    Issue One: Whether Petitioner Traveled to Afghanistan as a Part of the Islamic Movement of Uzbekistan and Received Military Training from that Organization**

    **1.    Factual Allegations**

        **i.    Respondents' arguments**

Based on statements Mingazov reportedly made to interrogators during his first years at Guantanamo Bay, respondents contend that while in Tajikistan, Mingazov became a member of the IMU. Respondents rely for this proposition on an FM40 of an interrogation of Mingazov that occurred on January 13, 2003, at Guantanamo Bay, which reports that after arriving in Tajikistan, Mingazov "decided to join the IMU." JE 1 at 1. They also point to an IIR of an interrogation of Mingazov at Guantanamo Bay dated July 18, 2003, which reports that Mingazov "served with the [IMU] around 2000-2001." PE 9[3] at 1.[4] Respondents further assert that, by Mingazov's own

---

      [3]     PE 9 is the same document as JE 4, but it reveals information redacted from JE 4. Respondents apparently initially produced to Mingazov's counsel the version of the IIR that is JE 4 and several months later turned over the version that is PE 9. The Court refers to PE 9 because the text available in that document that does not appear in JE 4 is relevant and, as explained below, exculpatory. The Court sees no possible justification for the redactions in JE 4.

      [4]     In this and several other intelligence reports quoted in this opinion, all or some text appears in the exhibit in all capital letters. For ease of reading, the Court will not reproduce quoted text in that manner.

SECRET

SECRET

admission in the interrogation that was the basis for the January 13, 2003 FM40 ████

████████████████████████████████████████████████████████████████ he

received military training from the IMU after traveling with other IMU members to Afghanistan.[5]

*See* JE 1 at 2 (reporting that Mingazov "received military training on the AK-47 rifle, PK

machine gun and shoulder fired grenades" while at a location called Mazar E Sharif with the

IMU in Afghanistan); JE 2 at 1 (reporting that Mingazov "spent two weeks in training" at "a

training camp of the [IMU] . . . located in Mazari-Shariff" where he "was shown infantry

equipment, how to make an explosive mixture and how to use TNT").[6]

Respondents contend that Mingazov's alleged membership in the IMU is a significant

part of their case. The IMU is a designated "Foreign Terrorist Organization." *See* GE 3 at 1

(U.S. Department of State press statement dated September 15, 2000 indicating an intention to

designate the IMU a "Foreign Terrorist Organization under U.S. law" based on criminal acts of

terrorism); GE 4 at 1 (U.S. Department of State press statement dated September 25, 2002

"announcing the redesignation of the [IMU] as a Foreign Terrorist Organization under U.S. law"

and stating that the IMU "has close ties to al-Qaida"). According to respondents, it is an

---

[5] It is not disputed that through the efforts of the IMU ████████████████
████████████████████████ a group of people, including Mingazov, were
transported ██████████ from Tajikistan to Konduz, Afghanistan. *See, e.g.*, JE JE 1 at 2; JE 2 at
1; JE 6 at 1; JE 7 at 6.

[6] At least one intelligence report indicates that Mingazov told his interrogators that
he attended military training run by the IMU while still in Tajikistan rather than after traveling to
Afghanistan. PE 9 at 1, 2 (reporting that Mingazov "attended IMU basic training in an isolated
apartment complex made into a camp . . . [in] a village near Dushanbe, Tajikistan" and
discussing "Mazar-E-Shariff" without asserting that Mingazov received training there).

SECRET

SECRET

"associated force" of Al Qaeda or the Taliban.[7] They therefore argue that Minagzov's detention is lawful based on Mingazov's membership in the IMU alone.[8]

### ii. Mingazov's arguments

Mingazov argues in response that he was not a member of the IMU. The declaration he prepared for use in this litigation provides his alternative explanation of his connection to that group. He stated that he went to Tajikistan because he wanted to make his way to Afghanistan; once there, he "was involuntarily held . . . in a civilian camp . . . that was run by the [IMU]" and "did not try to escape" because he "believed that the Uzbeks running the camp would transport [him] to Afghanistan." JE 141 ¶¶ 11-12. While held at that civilian IMU camp, which was near Dushanbe, Tajikistan, he did labor, such as "household chores, cooking, chopping wood, general maintenance, electrical wiring, etc." *Id.* ¶ 11. And he was ultimately taken, with a group of Uzbek refugees, to Afghanistan. *Id.* ¶ 13. In Afghanistan, he "lived in a refugee camp near Mazar e Sharif that was guarded by Uzbeks." *Id.* ¶ 14.

This innocent characterization of Mingazov's time with the IMU is consistent, he asserts, with most of his statements to interrogators at Guantanamo Bay. He first addresses the FM40

---

[7]      As noted above, "the government's detention authority also reaches" members of forces "associated" with Al Qaeda or the Taliban. *Hamlily*, 616 F. Supp. 2d at 74.

[8]      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ JE 17 at 1
(Declaration of Defense Intelligence Agency employee); JE 149 at 10 (Declaration of Eric McGlinchey, Professor of Public and International Affairs at George Mason University). Mingazov also argues that respondents have not shown that the IMU adopted additional goals, or took actions unrelated to this primary purpose, such that it became an associated force of Al Qaeda or the Taliban at the time Mingazov was allegedly an IMU member. The Court need not weigh the conflicting evidence regarding this point because its finding, explained below, that respondents have not shown that Mingazov was a member of the IMU makes resolution of the issue irrelevant.

9

SECRET

SECRET

that reports he said he "decided to join" the IMU. JE 1. He notes that the FM40 includes

additional statements, such as that the IMU was "vetting" him and that his responsibilities at the

IMU camps were as low-level as chopping wood, JE 1 at 1, that refute the contention that he

become a member of the IMU. The word "join," he maintains, poorly conveys his meaning in

speaking to the interrogators; he would have used a Russian word with a connotation suggesting

that he physically went to the location of the IMU's camp rather than that he became part of their

movement. Mingazov also notes that he professed during the interrogation not to know "if the

IMU and Al Qaida shared weapons or money" or that a certain IMU military commander had

been replaced, JE 1 at 1, 2, further demonstrating, according to Mingazov, that he did not have a

role in the military efforts of the IMU. Furthermore, he asserts that because "approximately one

hundred civilians accompanied the IMU to Afghanistan," JE 149 at 15, his movement across a

border with the IMU's assistance does not imply membership in the group.

Regarding the July 2003 IIR, Mingazov points to exculpatory statements respondents

ignore in making their argument.[9] According to the IIR, Mingazov stated that he "did not intend

to join [the] IMU but believed it to be an entry into Afghanistan" and that he "left the IMU . . .

due to poor living conditions and what he perceived as IMU's anti-Islamic ideas and mistrust of

him." PE 9 at 4, 5.

With respect to the allegations that Mingazov received military training from the IMU,

Mingazov again attacks the precision of the reporting of interrogations. According to Mingazov,

the note in the FM40 in question—"Mingazov said he also received military training on the AK-

---

[9]     These are the statements that were initially redacted from JE 4, the version of the
document to which respondents cited, but which are visible in PE 9. *See supra* note 4.

SECRET

47 rifle, PK machine gun and shoulder fired grenades," JE 1 at 2—provides no context and could refer to training in Russia years earlier. Mingazov reminds the Court that without a transcript or the interrogator's notes, it is impossible to know exactly what Mingazov said. Moreover, the repeated references in the FM40 to "vetting" and the IMU's distrust of Mingazov makes it unlikely, Mingazov reasons, that they provided him with military instruction.

██████████████████████████ Mingazov asserts that considered in context, the document does not prove that he became a member of the IMU. First, he points to a statement in the IIR that he "escaped from the IMU," JE 2 at 2, and another in a different report summarizing an interrogation ██████████████ that he "was kept separated from the rest [of the travelers]" during the journey to Mazari Sharif, JE 81 at 3 ███ ████████████████████████████████████████████ He argues that these statements confirm that he was not trusted by the IMU and thereby refute the proposition that he received military training from that organization. Second, Mingazov asserts that a third document███████████████████████████████████ ██████████████ also calls into question the proposition that he trained with the IMU or that he told his interrogators he did. *See* PE 2. ████████████████████████ *See id.* at 15-17, 19 (indicating that Mingazov said that while spending six months in a home in Tajikistan, he did "[a]bsolutely nothing, [he] was reading books and [IMU members] were watching me, observing my behavior" and that while he was in Mazari Sharif with the IMU, they "vett[ed]" him again, but he "did not become a member").[10]

---

[10] Mingazov also points to a document labeled "Analyst Support Package," which appears to consolidate information about Mingazov of interest to the American intelligence community but does not make clear its source or sources, because it states that Mingazov

SECRET

**2.    Reliability of Mingazov's statements**

    **i.    Mingazov's arguments**

In addition to attacking the validity of respondents' interpretations of the summaries of his interrogations at Guantanamo Bay, Mingazov argues that the Court should disregard some of his statements there because, out of fear of being sent back to Russia, he embellished or invented stories in the hopes of encouraging his American captors to keep him in U.S. custody.

To support the contention that he was threatened with and afraid of return to Russia, Mingazov points to a litany of relevant comments in summaries of statements made to and by himself, beginning years ago and continuing throughout his detention. In an FM40 of an interrogation on December 19, 2002, Mingazov's interrogator noted that "Mingazov was advised that he would most like [*sic*] be returning to Russia █████████████████████████

█████. The investigators said that they were concerned about Mingazov['s] status if he were to return[] to Russia. Mingazov said that he was aware that having served in the Russian army and having been arrested in Pakistan that the Russian authorities would most[] likely deal with him very sternly." JE 38 at 2. An IIR from July 2003 reports that Mingazov "told the investigator that [Mingazov] would tell [the investigator] everything if [the investigator] would give [Mingazov] a guarantee that [Mingazov] would not be sent to Russia." JE 2 at 2. An SIR dated August 9, 2004 reports that when Mingazov's interrogator asked "about his reluctance to return to Russia," Mingazov stated that other Russian citizens released from Guantanamo Bay were probably not permitted to "travel beyond their hometowns," and that "he especially didn't want to return because he was former military." JE 194 at 1. ████████████████

---

"appears to have no love towards [the IMU]." JE 236 at 2.

SECRET

█████████████████████████████████████████████

█████████████████████████████████████████████ Before his

Combatant Status Review Tribunal ("CSRT") hearing, Mingazov told his interviewer that he

"heard that conditions in [Guantanamo Bay,] Cuba were better than Bagram and Russia so I

made up a Big Story to be of interest to the CIA to guarantee I would come [to Guantanamo

Bay]." JE 6 at 1 (notes from undated interviews of Mingazov conducted in connection with the

proceedings before the CSRT). When Mingazov declined to appear at his CSRT proceeding on

October 28, 2004, his personal representative told the Tribunal that Mingazov had said "he did

not want to participate because he was afraid that if he was released back to Russia, he would be

imprisoned or killed." JE 153 at 1 (transcript of CSRT proceedings). At his Administrative

Review Board ("ARB") proceeding, Mingazov told the Board that he "did not want to go back to

Russia" and "[t]he only way [he] saw not being sent back to Russia was to make up stories on

[him]self, that [he is] a significant person." JE 7 at 7 (undated summary of proceedings

regarding Mingazov before an ARB).[11] Finally, in his declaration, he explained that a CIA

officer told him while he was in U.S. custody at Bagram that "unless [he] had high-value

information, the Americans would send [him] back to Russia," which he feared because in

---

[11]     Mingazov further explained that "[a] representative from Red Cross told [him]
that the living conditions in Cuba are very good," that he had heard that in America, people
"break the windows of department stores just to end up in jail in the winter time for three or four
months," and that he "read an article about the Geneva Convention" with information about
"how they treat prisoners," so he imagined that the conditions in Guantanamo Bay would be
better than those in Russia. JE 7 at 7.

SECRET

SECRET

Russia, he "would face imprisonment[,] torture and possibly even death." JE 141 ¶ 20.

Next, Mingazov argues that evidence regarding the treatment of other Russian citizens sent from Guantanamo Bay to Russia demonstrates that his fears were reasonable. Mingazov has submitted to the Court a report by Human Rights Watch asserting that "the Russian authorities have variously harassed, detained, mistreated, and beaten the former Guantanamo detainees since they returned." JE 151 at 2 (HUMAN RIGHTS WATCH, THE STAMP OF GUANTANAMO: THE STORY OF SEVEN MEN BETRAYED BY RUSSIA'S DIPLOMATIC ASSURANCES TO THE UNITED STATES (March 2007)).[12] He also cites a newspaper article reporting that a Russian man released from Guantanamo in 2004 "was killed . . . in a police raid" in June 2007. JE 203 at 1 (C.J. Chivers, *Russian Freed From Guantánamo Is Killed by Police Near Chechnya,* NEW YORK TIMES (June 28, 2007)).

Based on the proposition that Mingazov exaggerated his culpability to generate interest in keeping him as a prisoner, he asks the Court to disregard some of his admissions. In particular, he asks the Court to credit his recantations of assertions that he attended an IMU military training camp. These recantations appear in three documents. First, at some point after Mingazov's early interrogations at Guantanamo Bay, he denied attending a military training camp at Mazari Sharif, Afghanistan, although he admitted to being at a civilian IMU facility in the vicinity. *See* JE 6 at 2 (noting that Mingazov said he "wasn't in [the IMU] training camp" but was instead "being held at a civilian place near the camp involuntarily" where he did "small jobs such as maintenance and

---

[12]     The report further explains that "two of [the Russian citizens released from Guantanamo Bay] have been tortured and are in prison after investigations and trials that did not meet international fair trial standards; one has been tortured and is in prison awaiting trial; the other four are either abroad or in hiding." JE 151 at 2.

SECRET

SECRET

electrical wiring" and further that he "was not part of the IMU" but "just ended up being with them so [he] could get transportation to Afghanistan"). At another time, he stated that he "did not attend" the IMU's basic training program in Tajikistan, which was not open to him because the IMU had not "check[ed his] background," though he was "near the camp" while waiting for transportation to Afghanistan. JE 7 at 5, 6 (ARB proceedings summary reporting that Mingazov stated he "was not a member of" the IMU and that "anybody who actually wanted to go to Afghanistan, [transportation with the IMU] was the only way for them to get there"). Finally, in the declaration he made for use in this litigation, Mingazov stated that he "was never a member of the IMU" and "did not receive any training at the IMU civilian camp." JE 141 ¶ 12.

### ii.    Respondents' arguments

Respondents argue that Mingazov's admissions were not the product of coercion.[13] In particular, respondents make four points to support their contention that the statements contain indications that, contrary to his assertions, Mingazov did not make false admissions to avoid being sent to Russia. First, they note that Mingazov minimized his own culpability rather than emphasizing it such that he would more certainly be kept in U.S. custody. *See, e.g.*, JE 8 at 1 (FD-302 of interrogation of Mingazov at Guantanamo Bay on May 28, 2003 reporting that

---

[13]    Respondents make this argument to counter any attempt by Mingazov to contend that his statements are unreliable because they are the product of either physical or mental abuse. Although Mingazov has made some allegations of physical abuse, *see* JE 37 at 2 (SIR of interrogation of Mingazov dated October 25, 2006 reporting that Mingazov "claims that he was tortured for six days straight while in" U.S. custody in Afghanistan); JE 141 ¶ 19 (declaration of Mingazov dated April 28, 2009 stating that at Bagram, Mingazov "endured harsh conditions and suffered physical . . . abuse," in particular being "severely beaten, slammed into the ground, hung by [his] arms for extended periods of time, and deprived of food and sleep"), he has not relied on those allegations to discredit the portions of his statements he now asserts are false. This opinion therefore addresses only the issue of whether he was coerced by threats of return to Russia that allegedly amounted to mental abuse.

~~SECRET~~

Mingazov stated he "did not go to Afghanistan to fight"). Second, they point to Mingazov's

refusal to fully cooperate with his interrogators. *See, e.g.*, JE 1 at 1, 3 (noting that "Mingazov

refused to provide the name of his son" and, after answering a variety of questions, he "refused to

answer questions for an extended period of time"). ██████████████



██████████████████ Finally, respondents note that Mingazov

attempted to bargain with his interrogators. *See* JE 8 at 1 (reporting that in May 2003, Mingazov

told interrogators he "wants citizenship in Qatar before he will talk"); JE 7 at 13 (undated

summary of Mingazov's ARB proceedings reporting that Mingazov agreed that he had "offered

to exchange information about criminal activity for United States or European citizenship").

     Respondents also argue that the admissions are more reliable than Mingazov's

---

[14]    Respondents also cite an SIR of an██████████interrogation of Mingazov at
Guantanamo Bay to support this proposition. *See* JE 100 at 4 (reporting that "[t]he fact that the
detainee openly discusses any seemingly non-pertinent issue without flatly denying anything - in
this way purporting to cooperate and at the same time never saying anything that he deems is
important - is a sophisticated and effective counter-interrogation technique in and of itself").
This document describes a conversation devoid of any relevant admissions or even discussion of
topics pertinent to the factual issues raised in this case, and it notes immediately below the
observation on which respondents rely that "[i]nterrogator will continue to meet with the detainee
. . . . At this point[,] however, these are all mere suspicions on the interrogator[']s part." *Id.* The
Court therefore does not find that this document supports the proposition for which respondents
seek to use it.

~~SECRET~~

SECRET

recantations because the admissions contain details that are corroborated whereas Mingazov's declaration contains untrue statements. In particular, respondents note that Mingazov was able to accurately tell his interrogators at Guantanamo Bay the names of leaders of the IMU. *See* PE 9 at 2 (reporting that Mingazov knew the names of the leader and military leader of the IMU); JE 17 at 1-2 (declaration of Defense Intelligence Agency ("DIA") employee stating that these same men were leaders of the IMU).[15] In his declaration, however, Mingazov asserted that (1) he spent much of his childhood and part of his adult life in Naberezhyne Chelny in Russia, JE 141 ¶¶ 2-3, (2) he had difficulty communicating with Uzbeks in the IMU, *id.* ¶ 14, and (3) he was held in solitary confinement while in Guantanamo Bay, *id.* ¶ 21. Respondents argue that each of these statements is false, noting that (1) when shown a map Naberezhyne Chelny, Mingazov "gave incorrect information about the streets in his neighborhood" and became upset, JE 233 at 3 (interrogator notes of interrogation at Bagram, Afghanistan in June 2002); (2) there is support for the contention that in 2006, fifty-seven percent of Uzbeks could speak Russian, GE 2 at 2 (Ynus Khlikov, "Uzbekistan's Russian-Language Conundrum," *Eurasia Insight* (Sept. 19, 2006)); (3) "from ▉ March 2003 through ▉ April 2010], [Mingazov] has not spent any time in isolation or solitary confinement . . . [although he] was, at various times, removed from the general detainee population and housed in disciplinary cellblocks," GE 7 at 1 (Declaration of[2] ▉▉▉▉ Staff Judge Advocate of Joint Task Force - Guantanamo).

---

[15]    They also assert that because the purpose of the interrogations was to collect information for use by the United States military rather than in criminal prosecutions, the interrogators had no reason to force detainees to confess to wrongdoing. But the interrogators' intent, as well as the level of confidence the military has in particular information, has no bearing on whether that information meets relevant evidentiary standards for purposes of this judicial proceeding.

SECRET

SECRET

### 3.    The Court's findings

The evidence does not support a finding that Mingazov was a member of the IMU.  First, the statement that Mingazov "joined" the IMU ███████████████████████████████ ███████████████████████████████, is not conclusive when considered in context. Mingazov has consistently explained that the IMU was suspicious of his background and somehow "vetted" him while he was in their camps, calling into question the idea that he was welcomed into the organization.  In addition, he has repeatedly maintained that he left Russia in order to settle in a Muslim country and that, after making his way to Tajikistan, he came to understand that the IMU could assist with travel to Afghanistan.  This alternative explanation for his association with the IMU is plausible and not suspicious.

Second, Mingazov's assertions about his fear of returning to Russia are believable, as is the proposition that he thought being sent to an American facility in Guantanamo Bay was preferable to being sent to Russia.  These concerns make plausible the contention that Mingazov made false or exaggerated statements to his American captors in an effort to discourage them from releasing him from their custody.  Accordingly, the Court credits Mingazov's statements that he did not receive military training from the IMU and was lying when he said otherwise.[16]

Respondents' argument that Mingazov's admissions bear indicia of reliability that outweigh his later retractions is unconvincing.  Mingazov's failure to tell a story so exaggerated

---

[16]    Respondents argue that this explanation is not credible because Mingazov recanted part of his admissions in November 2003, *see* JE 5 at 1 (SIR reporting that Mingazov recanted earlier statements that he attended an Al Qaeda training camp), at which time he had no reason to believe that any change in conditions in Russia had occurred.  But Mingazov's personal calculations about the comparative risks or difficulty of staying in American custody versus being sent to Russia could change over time whether or not external circumstances had changed.

SECRET

SECRET

as to make himself seem highly dangerous or important in a terrorist network is hardly proof that he was not embellishing to a lesser extent to generate interest in further interrogating him. That Mingazov refused to answer certain questions does not demonstrate that he was at ease during interrogations or that the answers he gave to other questions were truthful. With respect to the use of counterinterrogation techniques, the Court will not draw any conclusions with so little indication of how often or for what purpose Mingazov may have employed them. Mingazov's attempts to bargain with his interrogators about his destination upon departure from Guantanamo Bay supports the proposition that he wanted to be sent somewhere other than Russia.

Moreover, the comparative reliability of Mingazov's admissions and recantations does not clearly fall in favor of the admissions. That Mingazov knew the names IMU leaders is as consistent with his having been in the vicinity of IMU members, or even living in a part of the world in which the activities of the IMU were likely to be in news reports, as with the proposition that he became a member of the organization. As to respondents' arguments that specific statements in Mingazov's declaration are untrue, the Court does not find that the assertions are necessarily lies or that inaccuracies invalidate the declaration in its entirety. In particular, the Court is not convinced that Mingazov's becoming upset when shown a map of his hometown or incorrectly answering questions about that map proves that he did not live there. Nor is the Court convinced that there were not at least some aspects of communication with Uzbeks at the IMU camps that were more difficult because Mingazov only spoke Russian, even if some of the people he encountered knew Russian. Finally, that Mingazov's statement about solitary confinement at Guantanamo was likely exaggerated is simply not a sufficient basis to discredit the remainder of the factual allegations contained in his declaration.

SECRET

SECRET

In sum, respondents have not convinced the Court it is more likely than not that Mingazov was a member of the IMU.

## B. Issue Two: Whether Mingazov Fought with the Taliban Against the Northern Alliance

Respondents argue that after leaving the IMU camp in Afghanistan, Mingazov fought with the Taliban against the Northern Alliance.[17] The only evidence respondents have submitted to support this allegation is an EC created on January 9, 2009. *See* JE 9.[18] The EC indicates that during an interrogation at Guantanamo Bay █████████████, "[w]hen asked if he fought with the Taliban, Mingazov stated he did and that he only fought against the Northern Alliance, not the Americans." *Id.* at 4. Mingazov strongly contests the reliability of this statement. Although the Court recognizes the significance of this allegation, it cannot determine based on the record before it that respondents have shown by a preponderance of the evidence that Mingazov was more likely than not a fighter for the Taliban.

The Court notes at the outset that the EC, and thus the allegation that Mingazov was a Taliban fighter, was not part of the record of this case until shortly before the merits hearing. Respondents filed the original factual return for Mingazov on November 25, 2008, and they subsequently filed motions for leave to amend it, each of which the Court granted, on five

---

[17]    The Northern Alliance is the name used for joint forces that sought to remove the Taliban from power in Afghanistan. The parties have not included in the record information about any particular battles that occurred before September 11, 2001, when Mingazov allegedly participated in fighting.

[18]    In making their presentation on this issue, respondents also point to a statement in an FM40 of a December 19, 2002 interrogation of Mingazov: "When asked if Mingazov would fight for Islam, Mingazov said that he would." JE 38 at 1. This statement is not evidence that Mingazov fought with the Taliban.

20

SECRET

~~SECRET~~

separate occasions: May 5, 2009; June 9, 2009; June 24, 2009; December 15, 2009; and March

25, 2010. Although all of these motions for leave to amend came after the FBI created the EC, it

was only in the fifth, March 25 motion that respondents sought to enter the EC into evidence.

Counsel for respondents explained that they did not locate the EC until March 19, 2010 and that

they provided it to Mingazov on March 22, 2010, once it was cleared for disclosure by the

appropriate Executive agencies. The parties' cross-motions for judgment on the record were

initially due on March 22, 2010. In a memorandum and order dated April 5, 2010 [#325], the

Court permitted the addition of the EC to the record, and accordingly denied Mingazov's motion

to strike it, because of the importance of ruling on the habeas petitions of Guantanamo Bay

detainees based on all of the available evidence. But the Court does not disregard the timing of

the disclosure of the EC and its effect on Mingazov's ability to respond to respondents'

accusations in determining what value to place on the document's contents.[19]

More importantly, there is no corroboration for the brief, undetailed statement on which

---

[19]     The circumstances surrounding the creation of this document also have
significance. Courts of this judicial district and circuit have accepted the consideration of
hearsay and other atypical forms of evidence in these cases because the litigation of habeas
petitions cannot be permitted to interfere with military operations. *See Boumediene*, 128 S. Ct. at
2288 ("The dangerous mission assigned to our forces abroad is to fight terrorists, not serve
subpoenas. . . . *Hamdi* expressly approved this use of hearsay by habeas courts."); *Hamdi v.
Rumsfeld*, 542 U.S. 507, 533-34 (2004) ("At the same time, the exigencies of the circumstances
may demand that, aside from these core elements, enemy-combatant proceedings may be tailored
to alleviate their uncommon potential to burden the Executive at a time of ongoing military
conflict. Hearsay, for example, may need to be accepted as the most reliable available evidence
from the Government in such a proceedings."). This rationale applies with significantly reduced
force to this particular interrogation report. This EC was written almost seven years after
Mingazov came into U.S. custody. Its author, ▓▓▓▓▓▓▓▓▓▓ is a Detective for the New York
City Police Department who was temporarily assigned to the FBI's Joint Terrorism Task Force
("JTTF"); ▓▓▓▓ and ▓▓▓▓▓▓▓, an FBI agent, conducted the interrogation. GE 8 ¶ 1, 4.
It is unlikely that ▓▓▓ in particular is unable to testify because he is participating in military
operations at a great distance from this Court.

~~SECRET~~

SECRET

respondents rely for the proposition that Mingazov was a Taliban fighter. The interrogators apparently did not ask Mingazov questions that elicited any additional information from him about, for example, where he fought or alongside whom. Without any details, the parties have been unable to verify or refute the allegation with any particularity. Significantly, respondents have not presented any evidence from any other person placing Mingazov in the company of Taliban fighters or otherwise indicating that he was likely a fighter with the Taliban. Moreover, despite the repeated interrogations of Mingazov over years of captivity, they cannot point to any other interrogation summary noting that Mingazov—even when trying to make himself out to be a valuable detainee to avoid being sent to Russia—said he was a Taliban fighter.

Furthermore, Mingazov attacks the reliability of the reporting in the EC. Most significantly, he denies having said he was a fighter for the Taliban.[20] To support the proposition that the EC's author did not accurately report what Mingazov said during the interrogation, Mingazov points to other factual inaccuracies in the document. In particular, he notes that the EC reports that Mingazov said "his family was good and that they are back in Russia." JE 9 at 2. But Mingazov's former wife, who had by January 2009 divorced him, was apparently actually living in Syria at that time. In addition, the EC reports that Mingazov attended a "technical school" after high school, *id.* at 3, but Mingazov went to ballet school, JE 141 ¶ 3. According to the EC, Mingazov "took a bus to the bridge" to leave Tajikistan for Afghanistan, *id.*, but many of

---

[20]     Counsel for Mingazov stated on the record at the merits hearing that Mingazov denied telling his interrogators that he fought with the Taliban. The Court recognizes that this declaration comes from the attorney rather than the client with personal knowledge of the issue. But the Court has no reason to, and does not, doubt that counsel's assertion is accurate. The late disclosure of the EC and the complications of communication with detainees at Guantanamo Bay excuses counsel's inability to provide the statement in a different form by the time of the hearing.

SECRET

SECRET

Mingazov's other statements indicate that he made this trip by helicopter. *See, e.g.*, JE 1 at 2; JE 2 at 1. The EC also indicates that Mingazov said he "was caught by the Pakistanis in Islamabad," *id.* at 4, but the record is clear that he was arrested in Faisalabad, *see, e.g.*, JE 141 ¶ 17. The EC reports that Mingazov went from prison in Pakistan to Kandahar, Afghanistan before being transferred to Guantanamo Bay. *Id.* There is no dispute, however, that he was taken to Bagram, not Kandahar. JE 141 ¶ 19. Respondents argue that these alleged errors are minor and do not call into question the reporting of the significant statement that Mingazov was a Taliban fighter. But these mistakes go to basic facts about Mingazov's story, and there are several of them. The nature and frequency of the errors[21] suggest that there were problems with the interpreter's translation, transcription of notes during the interview,[22] the drafting of the report,[23] or perhaps at all of these stages.

Mingazov has also noted that the declaration of FBI agent ███████████, one of his interrogators, submitted by respondents indicates that ████ and ████████████ the other interrogator and author of the EC, "attempted to conduct voluntary interviews with

---

[21]     Respondents specifically declined to concede at the merits hearing that the EC contains errors, maintaining that it most likely accurately reports the information Mingazov gave to the interrogators. The Court acknowledges that it is possible that Mingazov, rather than the translator or the interrogators, is the source of the incorrect information. If so, however, respondents' case is no stronger. If Mingazov gave untrue details about other parts of his life, he may also have lied about fighting for the Taliban.

[22]    ████████ "took contemporaneous notes during the ████████ interview of Mingazov." GE 8 ¶ 10 (Decl. of ████████). There is no indication in the record of whether ████████ also took notes.

[23]    ████████s "drafted the EC," and ████ "reviewed the EC and confirmed that it accurately reflected the interview." GE 8 ¶ 10. There is no indication in the record of whether ████████ relied on his own notes, ████████ or neither in writing the draft or whether ████ reviewed any notes to make his assessment of the draft's accuracy.

23

SECRET

~~SECRET~~

approximately 5 or 6 detainees" during their trip to Guantanamo. Government's Exhibit ("GE")

¶ 5. It is therefore possible, Mingazov contends, that some errors—and in particular, the

inclusion of the allegation that Mingazov fought for the Taliban—were the result of confusing

the information gathered from a different detainee with that derived from an interview of

Mingazov.

The Court does not take the allegation that Mingazov was a fighter lightly. If true, it

plainly justifies Mingazov's detention under the applicable legal standards. But the burden is on

respondents to demonstrate by a preponderance of the evidence that Mingazov fought with the

Taliban, and they have failed to do so. They present a short statement in a single report to

support the claim, and several facts about that evidence give the Court reason to hesitate to rely

on it. Taking all of the issues raised—the timing of the creation of the report and its disclosure,

the complete lack of corroboration, Mingazov's denial that he made the statement, and the errors

in the reporting of known facts—into account, this piece of evidence is not strong enough to

support a finding that Mingazov was a fighter.

**C.    Issue Three: Whether Mingazov Attended Al Farouq, Al Qaeda's Primary Training Camp, and a Separate, Advanced Training Camp in Afghanistan**

   **1.    Respondents' arguments**

Respondents assert that after September 11, 2001, Mingazov received military training at

an Al Qaeda camp called Al Farouq[24] and later received specialized explosives and poisons

---



[24]

JE 49 at 2 (Declaration

of ■ ████ intelligence analyst with the DIA).

~~SECRET~~

SECRET

training at a different camp in Afghanistan called Kara Karga.[25] Respondents argue that the Court should conclude based on these facts that Mingazov was a member of Al Qaeda.

To support the proposition that Mingazov attended these camps, respondents again rely on Mingazov's own statements. They cite the FM40 of a January 13, 2003 interrogation at Guantanamo Bay reporting that "Mingazov said he then went to a training camp called Al Faruq." JE 1 at 2. They also point to the IIR of Mingazov's statement 2 ▮▮▮▮▮ 2 ▮▮▮▮, which indicates that Mingazov said he "heard they were recruiting for the Arab training of 'Faruk,'" so he "went there out of curiosity to find out how the Arabs train" and that Mingazov later, also "out of curiosity," went to the "Kar(a) Korgl region," where he learned "how to make explosive mixtures, poisons and chemical grenades." JE 2 at 2. They also note that the IIR of a July 2003 interrogation reports that Mingazov "attended [Al Farouq] for one month with 60-70 students and was present at the camp on September 11, 2001." JE 3 at 1.[26]



---

[25]    Respondents do not have specific information about a camp called Kara Karga, but they ask the Court to infer, because "[m]any trainees were cross-trained between flagship al-Qaida camps and camps that were organizationally independent," JE 49 at 4, that it was one of the many Al Qaeda–affiliated camps operating in Afghanistan in 2001.

[26]    Respondents also rely on two FD-302s summarizing interrogations that occurred on December 30, 2002 and January 2, 2003, respectively. JE 11; JE 13. The first reports that Mingazov admitted to having received training on the Kalishnikov rifle but did not say where this training occurred, JE 11 at 1; the second reports that Mingazov said "he would not discuss any training that he received in Afghanistan," JE 13 at 1. Neither statement is an admission that Mingazov attended Al Farouq or any other Al Qaeda–affiliated training camp.

SECRET

SECRET

██████████████████████████████████████████████

### 2. Mingazov's arguments

Mingazov responds that he has denied having attended Al Qaeda training camps since November 2003. *See* JE 5 at 1 (SIR of interrogation of Mingazov dated November 14, 2003 reporting that Mingazov stated he "did not attend the Al Farouq camp," and "had heard about it but had never been there himself"); JE 6 at 2 (undated CSRT interview including statement from Mingazov that he "never went to al Farouq" and explaining that the allegation that he went there or to Kara Karga is illogical because "[he] only speak[s] Russian, so how could [he] take the training"); JE 7 at 7-9 (undated statement during ARB proceedings that Mingazov "was not in al Farouq" and that "[t]he information [he] gave to interrogators [regarding Al Farouq was] all according to stories [he] heard while working in Afghanistan" and that his statements regarding Kara Karga were based on a story he heard from another person); JE 141 ¶ 14 ("I did not ever go to the Al Farouq training camp in Afghanistan."). As with the allegations regarding military training with the IMU, Mingazov explained that he made his initial admissions to avoid returning to Russia. *See* JE 141 ¶ 20 ("During one of the interrogations at Bagram, I purposely said that I attended the Al Farouq training camp, that I observed Osama bin Laden while at the training camp and listened to his speeches on politics and religion, and that I received explosive training [at] the Karga Karga camp outside of Kabul. I said these things because a CIA officer told me that unless I had high value information, the Americans would send me back to Russia."). According to Mingazov, these incriminating statements about the camps contain few details, and those details that are included are inconsistent with what other detainees said about Al Farouq.

SECRET

SECRET

*Compare* JE 3 at 1 (IIR summarizing information, of which Mingazov was the source, acquired  reporting that "Al-Farouq teaches explosives, chemicals and assassination methods"); JE 11 at 1 (FD-302 summarizing interrogation of Mingazov at Guantanamo Bay reporting that "Mingazov stated he received training in Afghanistan on the Kalishnikov rifle; specifically how to check if a bullet is in the chamber . . . [and] how to quickly shift from firing from the left-hand to the right-hand") *with* JE 12 at 1 (summarizing an interrogation of a different detainee, who described basic training at Al Farouq as consisting of four two-week courses on "weapons training," "basic commando course," "topography," and "explosives," respectively) and JE 10 at 7 (FD-302 reporting that another detainee said he "received basic skills training on the Kalishnikov rifle, map reading, camouflage, artillery, and mountain tactics" at Al Farouq). Mingazov's statements are more consistent with guessing what Al Farouq was like, he asserts, than with having personal knowledge of the camp.[27]

Furthermore, Mingazov argues it is significant that respondents have provided no evidence that any other Guantanamo detainee has said he saw Mingazov at a training camp nor any evidence that Mingazov's name ever appeared on a list of training camp attendees.

---

[27]    Mingazov argues in the alternative that attendance at Al Farouq and Kara Karga is not proof of membership in Al Qaeda. Because the Court does not find that Mingazov attended an Al Qaeda–affiliated training camp, this opinion need not address that issue.

SECRET

SECRET



### 3. The Court's findings

The Court does not find that Mingazov attended Al Farouq or any other training camp. As explained in resolving the first issue presented by the parties, the Court finds Mingazov's assertion that he made false statements to his American captors to avoid being sent to Russia



SECRET

SECRET

credible. He has repeatedly and specifically recanted his statements that he went to Al Farouq.

And respondents have provided no corroborating evidence for their contention that he went to

either Al Farouq or another training camp.



Therefore, the Court finds that respondents have not shown by a preponderance of the

evidence that Mingazov attended Al Qaeda–affiliated training camps in Afghanistan.

**D.      Issue Four: Whether Mingazov Retreated from Afghanistan to Pakistan Following
the Invasion by the United States and Coalition Forces After the Attacks of
September 11, 2001 and was Captured in an Al Qaeda–Linked Guesthouse**

The parties do not dispute that Mingazov traveled from Afghanistan to Pakistan, stayed at

the Jama'at Al Tabligh Islamic Center there, and relocated to a guesthouse in Faisalabad,

Pakistan shortly before he was taken into custody during a raid on that guesthouse. Their

disagreement lies in the implications of taking part in these activities and being in these

SECRET

SECRET

locations. Respondents assert that the Court should infer from the circumstances of Mingazov's

departure from Afghanistan and time in Pakistan that Mingazov became a member of Al Qaeda.

Specifically, they argue that (1) he went to Pakistan along a route traveled by men who fought for

or alongside the Taliban who were fleeing Afghanistan after the fall of Kandahar; (2) the Jama'at

Al Tabligh organization with which Mingazov found shelter was employed as a front for terrorist

activities; (3) Mingazov was present at a guesthouse run by an Al Qaeda operative ("Abu

Zubaydah's house"); (4) he was sent to, and captured at, another guesthouse affiliated with Al

Qaeda ("Issa House"), and (5) it is incriminating that Mingazov was in possession █████████

████████████████████████████████████████████████, at the time of

his arrest. Mingazov counters that respondents' characterization of the facts is incorrect and

these events do not demonstrate an affiliation with Al Qaeda.[29]

## 1. Route to Pakistan

Mingazov's statements provide little information about his travel from Afghanistan to

Pakistan, although they consistently indicate that he departed from Khost, Afghanistan and

---

[29] In addition to making the more specific arguments described below, Mingazov points to two Department of Defense memorandums to counter the general proposition that he was a member of Al Qaeda. The first, dated December 5, 2002 and produced by the Department's Joint Task Force GTMO, concluded that Mingazov "is assessed as having low-level ties to al-Qaida." JE 152 at 1. The second, dated December 6, 2002 and produced by the Department's Criminal Investigation Task Force ("CITF"), noted that "CITF is not aware of any evidence to suggest [Mingazov] was a member of al Qaeda." JE 234 at 2. The inconsistent conclusions of these two documents are perhaps more probative of the inner workings of the intelligence community than of the facts they purport to relate. Because both appear to reach a conclusion based on many of the same facts that are now presented to this Court, *see* JE 152 at 1; JE 234 at 1-2, they are not entirely irrelevant to assessing whether Mingazov was a member of Al Qaeda. But the Court will reach its own conclusion as to this question based on the evidence before it and according to the evidentiary standard applied in cases brought by Guantanamo Bay detainees.

SECRET

SECRET

traveled some of the way on foot. *See* JE 1 at 2 ("Once the bombing started Mingazov decided to leave Afghanistan. Mingazov made his way to Khowst, Afghanistan in a car with Arabs and Uzbeks. Mingazov said he walked across the Pakistan border."); JE 2 at 2 (reporting that Mingazov said that after "[t]he Americans started bombing," people in Kabul panicked and "everyone got in cars and headed towards Pakistan," so Mingazov traveled to "the Khust region ravines" where, because Mingazov "didn't want to fight," he "got in a car with some Arabs" and was taken to Khowst, from which he was led by an Afghan guide to Bannu, Pakistan); JE 6 at 2 (reporting that in response to an allegation that he "fled Afghanistan following the U.S. bombing campaign," Mingazov said he "joined the people running and even the guards who were guarding [Mingazov] were running so [he] just followed them" and further explained that he "didn't know the language, [] didn't know the place, [he] just went with the other refugees"); JE 141 ¶ 15 ("In October 2001, when the Americans began bombing Afghanistan, the conditions in the camp where I was living became chaotic. I joined with a group of other refugees who were fleeing the country and traveled to Pakistan by car and on foot."). Mingazov argues that his statements are consistent with the fact that thousands of people were fleeing Afghanistan for Pakistan beginning in mid-September 2001. *See* JE 155 at 1 (LAURA HAYES AND BORGNA BRUNNER, TIMELINE: THE TALIBAN).



31

SECRET



Respondents assert that because the route Mingazov ▓▓▓▓ describe is similar to that taken by another Guantanamo detainee who admitted affiliation with Al Qaeda, Mingazov's travel is probative of Al Qaeda membership. They have submitted to the Court two documents, each of which summarizes interrogations of the same detainee, ISN 707, to support the proposition that the route Mingazov took was one Al Qaeda members used. *See* JE 32 at 4, 5 (IIR summarizing interrogation of ISN 707 at Guantanamo Bay[2] ▓▓▓▓▓▓▓ reporting that

32

SECRET

~~SECRET~~

ISN 707, who was a "primary weapons instructor" at a training camp and who "came in contact with many members of Al Qaida leadership in [Afghanistan] and Pakistan," "stayed in Kabul until shortly before it was liberated by Northern Alliance forces in late 2001," then "fled by car to Khowst" and later "sneaked across the [Pakistani] border at night to Bannu"); JE 33 (IIR of interrogation of ISN 707 ▇▇▇▇▇▇ reporting that ISN 707 "and others snuck across the border at night to Banu, Pakistan, where Abu Zubaydah was waiting for them with transportation").

Despite respondents' suggestions, the Court does not find Mingazov's travel incriminating ▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇ But that information alone does not indicate any nefarious action or purpose. ▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇.[31] The similarity of Mingazov's route and the one ISN 707 took does not persuade the Court to reach a different conclusion. There is no evidence in the record to support the implied suggestion that there was some other, easier route out of Afghanistan or that civilians did not travel in this manner. To the

---

[31] Respondents also ask the Court to draw an inculpatory inference from the fact that Mingazov's declaration notes that bombing began in Afghanistan in October 2001 ▇▇▇▇ (Mingazov does not dispute respondents' contention that the fall of Kandahar ▇▇▇▇ ▇▇▇▇ occurred on December 7, 2001.) But Mingazov does not bear the burden of proof in this proceeding, and the Court has already rejected respondents' suggestion that Mingazov was fighting for the Taliban during that time.

~~SECRET~~

SECRET

contrary, the record shows that several people as to whom there is no evidence of Al Qaeda

membership—

In addition, as Mingazov notes

and in contrast to the experience of ISN 707, neither Mingazov nor ▮ indicated that Abu

Zubaydah, an Al Qaeda operative, or any other Al Qaeda member met them in Bannu.

### 2. Jama'at Al Tabligh Islamic Center

Mingazov stated in his declaration that he "stayed at a Tablighi Islamic center in Lahore

and traveled with other Muslims who were engaged in the peaceful practice of the Muslim

religion. The reason [he] stayed there is because [he] had no money and no passport and there

[he] could stay for free and was provided with food. [He] was with the Muslims of the Tablighi

for approximately two months in early 2002." JE 141 ¶ 16.

Respondents contend that Mingazov's stay at the Jama'at Al Tabligh Islamic Center

supports a finding that Mingazov joined Al Qaeda because members of Al Qaeda often used

Jama'at Al Tabligh as a front. To prove this proposition, respondents point to several sources,

none of which convince the Court that Mingazov's stay at the Islamic Center is evidence of the

contention that he was part of Al Qaeda.

 The D.C. Circuit

has made clear that hearsay evidence "must be presented in a form, or with sufficient additional

~~SECRET~~

information, that permits [the factfinder] to assess its reliability." *Parhat v. Gates*, 532 F.3d 834, 849 (D.C. Cir. 2008). Here, without knowledge of the source or "the circumstances under which the source obtained the information," the Court cannot evaluate the document's reliability. *Boumediene v. Bush*, 579 F. Supp. 2d 191, 197 (D.D.C. 2008); *see also Anam v. Obama*, — F. Supp. 2d —, 2010 WL 58965, at *8 (declining to rely on an intelligence report of which "[t]he source (or sources) . . . is unknown" and another that "lacks any indicia of reliability"). Accordingly, the Court will not rely on the information ████████████████

Respondents also highlight an IIR that reports that "[t]he preachers of Islam, or Tablighi Jamaat, organization has been supporting Islamic terrorist groups in south and southeast Asia under the cover of conducting religious activities. The group is closely aligned with other Pakistani terrorist organizations and the Al-Qaida network." JE 24 at 3. The IIR indicates that its source is "Internet"; it appears that the Department of Defense collected the information from the web sites of PakTribune, Asia Times, and South Asia Analysis Group. *Id.* at 2. The relevant articles were dated December 17, 2002, October 15, 2002, and June 21, 2002, respectively. *Id.*[33]

In response to these allegations, Mingazov has submitted a declaration from a professor who studies Jama'at Al Tabligh. *See* JE 156 (Decl. of Barbara Metcalf, Professor of History at the University of Michigan). The professor describes Jama'at Al Tabligh as a movement, rather

████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[33]    If the articles indicated where their authors collected the information reported, the author of the IIR stripped those indications from the intelligence report.

~~SECRET~~

SECRET

than an organization with any sort of hierarchy; participation involves joining a group of ten to

twelve males who travel together to gather Muslims and instruct them in following Islamic

practices. *Id.* at 1. She concludes, therefore, that "[t]here may well be cases in which . . . a

person would claim to be involved in Tablighi activities as a cover – but since millions of people

participate in the Tablihgi Jamaat, that would be an exception." *Id.* at 2. Mingazov also cites

two documents indicating that Jama'at Al Tabligh followers are not permitted to advance any

political agenda. JE 157 at 2 (Decl. of Jamal Elias, Professor of Religion at Amherst College);

JE 158 at 2-3 (Letter from Qamar-ul Huda, Senior Program Officer, Religion and Peacemaking

Center of Innovation, United States Institute of Peace).

In the absence of any evidence that Mingazov or any person with whom he affiliated

while at the Islamic Center had any connection to Al Qaeda, the Court does not find his stay there

incriminating.[34]

### 3. Abu Zubaydah's house

Upon arrival in Faisalabad, Mingazov was initially taken to Abu Zubaydah's house but

---

[34]     Respondents also argue that the connection between the Jama'at Al Tabligh
Islamic Center and the Al Qaeda guesthouses is evidence of the two organizations' affiliations.
To support the factual basis of this argument, they cite first to Mingazov's statement, reported in
the IIR summarizing his interrogation          that after spending two and a
half months at the Center, "the Pakistanis sent [Mingazov] to Faizoloban to a private residence."
JE 2 at 2. They also cite an SIR of another Guantanamo Bay detainee, ISN 688, which reports
that ISN 688 told his interrogator that he was invited to stay "at a house," called "Issa House,"
which was "connected to the Jama'at Al-Tabligh mosque." JE 35 at 6 (SIR dated December 18,
2006). This information only aids respondents' case if the Court finds that the residence to
which Mingazov was sent and to which ISN 688 refers, Issa House, is affiliated with Al Qaeda.
Because, for the reasons explained below, the Court finds that respondents have not proven such
a connection, the Court will not draw any inculpatory inferences from this evidence that the
Jama'at Al Tabligh movement has some link to the house.

SECRET

was sent to Issa House instead. █████████████████████████████████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

████████████████████████████ There appears to be no dispute that Abu Zubaydah was an Al

Qaeda operative and that Al Qaeda–related activities took place in his house. Mingazov argues

that his brief time at this location, to which he contends he was sent by mistake, is not evidence

of an affiliation with Al Qaeda. Respondents counter that there is no evidence Mingazov was at

the wrong location; he spent a night at Abu Zubaydah's House, rather than being turned away,

before moving to Issa House.

The Court draws no particular conclusions from the evidence as to this issue.

Accordingly, it will consider the undisputed fact that Mingazov was present for one night at Abu

Zubaydah's House in the context of the other facts respondents have proved by a preponderance

of the evidence in assessing whether respondents have shown that Mingazov was more likely

than not a member of a terrorist organization.

**4.    Issa House**

Respondents argue that Mingazov's presence at Issa House is strong evidence that he was

part of Al Qaeda. █████████████████████████████████████████

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████

SECRET

SECRET



Mingazov responds that several intelligence reports summarizing interrogations of

individuals taken into custody during the raid of Issa House demonstrate that many occupants of

the house were students rather than Al Qaeda members. *See* JE 164 at 1-2 (Department of

Defense memorandum dated April 4, 2004 summarizing the statements of ISN 680, a Yemeni

who asserted that he was a student at Salafeyah University in Faisalabad, Pakistan and that he



SECRET

SECRET

lived, with fifteen other students, at a house run by "[a] Pakistani named Issa" where he was

"arrested by Pakistani authorities"); JE 166 (FM40 of interrogation of ISN 681 dated January 4,

2005 reporting that ISN 681 "stated he knew very little about the guesthouse, but estimated that

approximately 14 people stayed there, mostly students at the local madrassa," called "Salifast

University"); JE 167 at 2 (SIR of interrogation of ISN 688 dated May 14, 2005 reporting that,

when shown pictures of the individuals arrested at Issa House, ISN 688 identified eight of

eighteen as students at "Salafia University," one as Mingazov, two as the "cook" and "doorman"

of the house, and none as Al Qaeda members); █████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████ This information, Mingazov contends, disproves respondents' theory that Issa

House had a strong Al Qaeda connection and anyone staying there must be part of Al Qaeda.

Mingazov further argues that his presence at Issa House at the time of a raid by Pakistani

police is consistent with the possibility that he was led there to be captured because he could

generate a bounty.[37] He stated in his declaration that he "learned from a U.S. Special forces

---

[36]      Mingazov himself said at his ARB proceeding that he "did not know [Issa House]
was an al Qaida safe house," he "did not know anything about al Qaida," and "[w]hen [he] was
captured [he] was told that this was the house of Abu Zubaydah," but he "[had] not see[n] Abu
Zubaydah in that house." JE 7 at 11.

[37]      Mingazov also argues that collateral estoppel should act to bar respondents from
litigating the question of whether residence at Issa House is evidence of participation in terrorist
activities because Judge Kessler ruled on this issue in a prior case to which respondents were

SECRET

SECRET

officer at Bagram that [Issa H]ouse was a place where people were lured in only to be arrested by the Pakistani police [who] would turn the people over to U.S. forces for a bounty." JE 141 ¶ 17. According to a report Mingazov submitted to the Court, eighty-six percent of the detainees at Guantanamo Bay were captured by Pakistani or Northern Alliance forces and "were handed over to the United States at a time in which the United States offered large bounties for capture of suspected enemies." JE 191 at 3 (MARK DENBEAUX AND JOSHUA DENBEAUX, THE GUANTANAMO DETAINEES: THE GOVERNMENT'S STORY (undated)); *see also id.* at 23-25 (reproductions of leaflets offering money in exchange for aiding in the capture of alleged Al Qaeda or Taliban fighters). At least one other Guantanamo Bay detainee who was also arrested in a raid of Issa House believed that he was transferred to American custody in exchange for a bounty because "[t]he Pakistani[] guards were saying that we were worth $5,000." JE 175 at 6, 10 (undated testimony, likely before the CSRT, of ISN 683).[38]

The Court will not conclude from the evidence before it that Mingazov's presence at Issa House demonstrates that Mingazov was part of Al Qaeda. Respondents' evidence is unpersuasive as to this point. ████████████████████████████

---

party. *See* JE 161 at 34-40 (*Ahmed v. Obama*, Civil Action No. 05-1678, classified slip op. (D.D.C. May 4, 2009)). The habeas cases brought by detainees held at Guantanamo Bay are different than any other litigation typically before this Court. For that reason, the application of the principle of law Mingazov seeks to apply is at least in doubt. Because the parties have not fully briefed this issue, the Court declines to consider it.

[38]     The parties explained at the merits hearing that Mingazov requested and the Court ordered, but respondents did not disclose, any evidence regarding the payment of a bounty in exchange for the transfer of Mingazov into U.S. custody. Respondents were apparently unable to locate any such information regarding Mingazov or any other Guantanamo Bay detainee.

SECRET

~~SECRET~~



Because the Court is therefore unable to evaluate the reliability of the information ███████ it will not rely on it. See *Parhat*, 532 F.3d at 849; *Boumediene*, 579 F. Supp. 2d at 197; *Anam*, 2010 WL 58965, at *8.[40]

On the other hand, the evidence demonstrating that many of the occupants of Issa House were students is persuasive. Although ███████████████████ the relevant interrogation summaries are hearsay, the statements therein come more directly from individuals who were at the house and are consistent across several intelligence reports. ████████████

████████ offers no response to or explanation for this indication that many occupants of Issa

41

~~SECRET~~

~~SECRET~~

House were students. The Court therefore finds credible the proposition that some, and possibly most, of the occupants of Issa House were not members of Al Qaeda.

As to the issue of whether Mingazov was led to the house so he could be captured and exchanged for bounty, there is not enough information before the Court to conclusively determine the circumstances of Mingazov's transfer to U.S. custody. But the Court does take into consideration the evidence about the prevalence of payments for prisoners as well as the indication that both Mingazov and another man arrested at Issa House believed based on statements from American and Pakistani guards, respectively, that the United States paid to take custody of them. This information decreases the likelihood that the purpose of the raid on Issa House was to identify and capture only men who were part of Al Qaeda.

Therefore, respondents have not shown by a preponderance of the evidence that Mingazov's capture at Issa House is evidence of his membership in Al Qaeda.

5. █████████████



~~SECRET~~

SECRET



**E.     Conclusion**

Mingazov's proximity to people engaged in military action, stays at guesthouses where

members of Al Qaeda may also have stayed,[41]

---

[41]     The Court notes that the D.C. Circuit has suggested that evidence that a detainee "visited Al Qaeda guesthouses . . . would seem to overwhelmingly, if not definitively, justify the government's detention" of that individual. *Al-Bihani*, 590 F.3d at 873 n.2. The Court has explained in its previous rulings on the habeas petitions of other Guantanamo Bay detainees that this statement is dicta and for other reasons should not necessarily control the outcome of these cases. *Abdah v. Obama*, — F. Supp. 2d —, 2010 WL 1626073, *10 n.17 (D.D.C. April 21, 2010); *Abdah v. Obama*, — F. Supp. 2d —, 2010 WL 1798989, at *20 n.25 (D.D.C. April 18, 2010). Here, respondents have failed to show that Issa House was an Al Qaeda guesthouse. The

SECRET

~~SECRET~~

███████████████████████████ raise the suspicion that he was something more than an innocent traveler seeking a new home for his family. But respondents have not met their burden of proof as to their allegations that Mingazov became a member of the IMU, fought with the Taliban, attended Al Farouq or any other military training camp, or became a member of Al Qaeda. Therefore, respondents have not demonstrated that Mingazov was "part of" the command structure of any terrorist organization. *Hamlily*, 616 F. Supp. 2d at 69-70. Nor have they presented evidence on the basis of which the Court could infer that he had such a status. Consequently, the Court concludes that Mingazov's petition for a writ of habeas corpus must be granted.

### III. CONCLUSION

For the foregoing reasons, Mingazov's petition for a writ of habeas corpus shall be granted. An appropriate order accompanies this memorandum opinion.

Henry H. Kennedy, Jr.
United States District Judge

May 13, 2010

---

Court simply will not conclude that a one-night stay at Abu Zubaydah's house, where Mingazov was unable to communicate with most if not all other occupants, from which he was sent away shortly after his arrival, and which goes in no way to show that Mingazov was part of Al Qaeda's command structure, meets the standard for lawful detention.

44

~~SECRET~~